

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| HOLLY M. EISCHENS,<br><br>    Plaintiff,<br><br>vs.<br><br>FURNITURE OUTLETS USA, INC., d/b/a as UNCLAIMED FREIGHT FURNITURE,<br><br>    Defendant. | 10 - 1031<br><br>**COMPLAINT** |

COMES NOW the Plaintiff Holly M. Eischens, through her undersigned counsel, and states and alleges as follows:

## JURISDICTION

(1) This is a sexual harassment and retaliation claim arising under Title VII of the Civil Rights Act of 1964, 42 USCA §2000e, et seq.

(2) Plaintiff Holly Eischens ("Eischens") is an adult female currently residing in Watertown, South Dakota.

(3) Furniture Outlets USA, Inc. is a South Dakota corporation doing a retail sales business as Unclaimed Freight Furniture ("Unclaimed Freight") at various South Dakota locations including Watertown, South Dakota.

(4) Eischens was employed at the Unclaimed Freight store in Watertown on May 26, 2008 and alleges that she was constructively discharged from employment on July 28, 2009.

(5) Eischens filed a charge of discrimination with the South Dakota Division of Human Rights on or about October 2, 2009 and was mailed a Notice of Right to Sue on October 20, 2010.

(6) This Court has jurisdiction over Eischens' sexual harassment and retaliation claims pursuant to 42 USCA § 2000e-5(f)(3) and 28 USCA §§ 1331 and 1343(4). Venue is proper in accordance with 28 USCA § 1391 (b) and 42 USCA 2000e-5(f)(3).

## FACTUAL ALLEGATIONS

(7) Eischens was hired by Unclaimed Freight on or about May 26, 2008.

(8) Eischens performed her position in a manner that met Unclaimed Freight's expectations.

(9) Unclaimed Freight hired Brian Holter as Eischens' direct supervisor in mid-April 2009.

(10) Unclaimed Freight has a sexual harassment policy that "strictly prohibits" sexual harassment, including "… sexual comments, including sexual gestures, jokes, or comments made in the presence of any employee who has indicated that such conduct is unwelcome…."

(11) Almost immediately after he became her supervisor, Holter began to subject Eischens and other female employees in the Watertown Unclaimed Freight store to gender-based, sexually-offensive comments.

(12) Eischens and the other female employees indicated to Holter that they did not like or appreciate his sexual remarks but Holter persisted.

(13) On or about June 4, 2009, Eischens and two other female employees at the Watertown Unclaimed Freight store made a complaint about sexual harassment to Holter's

supervisor, Jim Heinitz, These comments included Holter's suggestions that the female employees should put on bikinis and walk up and down the sidewalk to sell furniture; by repeatedly asking if a female employee was feeling ill because she was pregnant; by making comments to a female employee about her menstrual cramps; by suggesting by a sexual innuendo that he has a cure for Eischens' headache; by asking a female employee who was looking for something in her desk if she had a penis in her desk; by explaining the sex scenes from the movie "The Graduate" to relate his claim that he was having a sexual relationship with a female customer; by remarking to a female employee that he had a rock hard bed but not much action there; by remarking about having three testicles when Eischens made a serious inquiry about the effect of having asbestos in the store ceiling after a fire in the store; and by suggesting to Eischens that she should make a sale by having sex with a male customer.

(14) Heinitz reported the three employees' sexual harassment complaints to Unclaimed Freight's Human Resources Department.

(15) After investigation, Unclaimed Freight made a determination that Holter had violated it sexual harassment policy.

(16) Unclaimed Freight disciplined Holter for his violation of its sexual harassment policy as follows:

(a) On June 10, Cory Price, a supervisor from the home office, was sent to the Watertown store to conduct "more training" with Holter and to evaluate the store situation. During this training, Holter was advised that he should never talk about sexual body parts to employees; that he should not makes jokes of a sexual manner; that he should not make derogatory comments about customers; that he should not

describe his sex life to employees; that he should not ask female employees to wear bikinis to sell furniture; that he should ask employees about pregnancy or menstrual cramps and should otherwise be careful to avoid remarks that could be offensive.

(b) On June 12, two other supervisors were sent to the Watertown to deliver a written disciplinary warning to Holter, to personally explain that sexual harassment would not be tolerated and to conduct a specific "supervisory harassment training program" for Holter;

(c) On June 18, Holter was required to attend a meeting at the Sioux Falls home office to review a "harassment prevention training" program.

(17)    After she had reported Holter's sexually harassing behavior, Holter began to change Eischens' work schedule in a manner that negatively affected Eischens performance.

(18)    After she had reported Holter's sexually harassing behavior, Holter made Eischens and at least one other female employee who had complained about Holter's workplace behavior fear that they were going to be terminated for poor performance.

(19)    After she had reported Holter's sexually harassing behavior, Eischens began to experience fear, anxiety and depression about going to work because of Holter's hostile attitude toward her.

(20)    On June 25, Eischens' husband called Holter to instruct him to treat Eischen's professionally and to cease retaliating against her for rejecting his "disgusting" behavior. It is not disputed that Eischens was not a party to this phone call. Holter reported this call to supervisor Cory Price.

(21) On June 25, Price verbally disciplined Eischens for harassment of Holter because of her husband's phone call. However, Price did not report this behavior to Unclaimed Freight's Human Resources Department as harassment.

(22) On July 1, Holter reported Eischens to Unclaimed Freight's Human Resources Department for allegedly harassing him via her husband's phone call. Holter told Unclaimed Freight that Eischen's husband had called him to complain about Eischens' work conditions, that Eischens' husband had been upset and used vulgarity and warned Unclaimed Freight that her husband might also call the home office to complain about him.

(23) Despite this report, Unclaimed Freight did not contact Eischens to find out whether this allegation was accurate, whether she was even aware that her husband had made the phone call or what issues she was having with her work conditions even though it was aware that Holter had received a written warning and other disciplinary for his sexually harassing behavior toward Eischens and other female employees less than a month earlier.

(24) On July 15, Eischens both called and wrote to Unclaimed Freight's Human Resources Department to report that Holter continued to be unprofessional and had made another sexually offensive remark in the workplace in her presence despite his written warning and training. Specifically, Eischens reported that Holter had suggested to Eischens and another male employee that the male employee should take the store's petty cash and go to South Fork, a local strip club.

(25) Unclaimed Freight did not contact the other employees in the store to determine whether Holter was continuing to make sexually offensive remarks in the workplace after Eischens' July 15 report.

(26)   On July 17, Unclaimed Freight emailed Eischens to blankly state that her July 15 complaints had been "dealt with at the home office."

(27)   On July 20, when Eischens asked to used Holter's desk to complete some paperwork, Holter remarked that she should sit on his lap.

(28)   On July 21, Unclaimed Freight issued a written disciplinary warning to Eischens about alleged poor performance based on Holter's recommendation.

(29)   On July 23, Eischens emailed to Unclaimed Freight's Human Resources Department to report Holter's July 20 comment about sitting on his lap to finish the task. Eischens complained that Holter's continued comments made her sick and bluntly expressed that she could no longer tolerate the work environment because of the ongoing sexual harassment.

(30)   On July 24, Unclaimed Freight's Human Resources Department advised Eischens that Holter would be receiving a final written warning for his comments on July 27.

(31)   On July 27, Eischens had no contact from Unclaimed Freight's Human Resourcces Department by phone, by email or in person.  No supervisor from Unclaimed Freight came to the store.   Instead Eischens was assigned to work with Holter all day.

(32)   On July 27, Holter became visibly angry at Eischens and intentionally threw a wadded up ball of Teflon strip at Eischens' breast in response to her statement that she was leaving for her lunch break.

(33)   After Holter struck her in the breast on the same day that he was supposed to receive a final written warning for sexually harassing her, Eischens became extremely anxious and fearful for her physical safety.

(34) On the afternoon of July 28, when Eischens still had not had any call, email or personal confirmation from Unclaimed Freight that Holter had received a final written warning and that she would be protected from retaliation, Holter approached Eischens and told her that he was going to give her a written disciplinary warning for removing "12% off" tags from merchandise. When Eischens said to go ahead with the write up, Holter went to the computer and advised Eischens that he had to document everything that happened in the store. Holter then asked Eischens for her resignation.

(35) Eischens responded by saying that she was done working there, tossed her store key to another female employee and left.

(36) Immediately after Eischens left, Holter sent an email to Unclaimed Freight's Human Resources Department documenting that he had told Eischens he was writing her up, that he had asked Eischens for her resignation and that she had then said she was done working there and tossed her store key to another employee.

(37) Holter was immediately advised by Unclaimed Freight's Human Resources Department that he did not have authority to ask for her resignation and that "[b]ecause of the prior on-going issues between you and Holly, this could be bad for all of us." Holter then emailed a different version of Eischens' termination, stating that Eischens had said that she was done working there, tossed her keys and then he asked for her resignation.

(38) Unclaimed Freight responded Holter's second version of Eischens' termination by email, responding: "That is NOT what it says... you wrote that you asked for her resignation – which is it?" Holter then responded: "After rereading the first email I sent out, you are correct. Holly tossed me the keys and said she was done. I then asked her if she was going to write a resignation letter."

(39) Despite the two different stories Holter had and its concern about the ongoing sexual harassment complaints, Unclaimed Freight made no ffort to contact Eischens and advise her that Holter did not have authority to terminate her or ask for her resignation or to otherwise advise Eischens that Holter had been disciplined in any way for her July 23 report of sexual harassment.

## SEXUAL HARASSMENT
## 42 USCA § 2000e et seq.

(40) Eischens reasserts her allegations in paragraphs 1-39 herein.

(41) Eischens is a member of a protected class because of her gender.

(42) Eischens was subjected to unwelcome sexual harassment in the form of offensive comments and offensive physical contact from her direct supervisor.

(43) Eischens and other female employees made at least four reports of their direct supervisor's violations of the company's sexual harassment policy in a four month period.

(44) Because of the frequency, duration and increasing intimidation of the direct supervisor's action, Eischens was subjected to a hostile work environment because of her direct supervisor's sexually harassing behaviors.

(45) Eischens and other women who worked in the Unclaimed Freight store in Watertown were treated worse than male employees were by their direct supervisor because of their gender.

(46) The direct supervisor's s sexually offensive harassment adversely affected the terms and conditions of Eischens' employment, including her work hours, her work environment, her pay and her ability to continue working at Unclaimed Freight.

(47) During Eischens' employment, Unclaimed Freight had determined that Eischens and two other female employees had made legitimate reports of their direct supervisor's sexual harassing behavior.

(48) Unclaimed Freight was aware that its written disciplinary warning, meetings and training videos were not sufficient to stop the direct supervisor's sexually harassing behaviors.

(49) Unclaimed Freight failed to take proper remedial action reasonably calculated to stop the direct supervisor's sexual harassment.

(50) Unclaimed Freight rendered Eischens' work conditions so difficult that Eischens felt compelled to quit.

(51) As a proximate result of sexual harassment, including physical touching and intimidation, Eischens suffered physical illness, stress, humiliation, anxiety, lost wages, benefits and incurred costs and expenses as a result of being unemployed.

(52) Unclaimed Freight's actions and inactions were willful, reckless and malicious.

### RETALIATION
### 42 USCA § 2000e-3(a)

(53) Eischens reasserts her allegations in paragraphs 1-52 herein.

(54) Eischens was engaged in statutorily protected activity when she opposed and reported her direct supervisor's sexually harassing behavior.

(55) Eischens received repeated disciplinary actions and had her work schedule changed as a proximate result of her complaints of sexual harassment.

(56) Within 24 hours of her direct supervisor receiving a final written warning for sexually harassing Eischens, her direct supervisor threw and object and hit Eischens in the

breast, threatened to discipline Eischens for removing sales tags from sales furniture and asked Eischens to submit a resignation letter.

(57) Unclaimed Freight rendered Eischens' work conditions so difficult that Eischens felt compelled to quit.

(58) As a proximate result of retaliation, including physical touching and intimidation, Eischens suffered physical illness, stress, humiliation, anxiety, lost wages, benefits and incurred costs and expenses as a result of being unemployed.

(59) Unclaimed Freight's actions and inactions were willful, reckless and malicious.

## PRAYER FOR RELIEF

WHEREFORE, Eischens prays for judgment against Unclaimed Freight as follows:

a. For a trial by jury upon the merits of her claims;

b. For compensatory damages for each of her claims in such amount as the evidence at trial may show;

c. For damages against Unclaimed Freight including but not limited to those damages allowed by 42 USCA § 2000e et seq. and any other pertinent and applicable statute, rule or regulation, whether state or federal;

d. For punitive damages against Unclaimed Freight for each of her claims in such amount as the evidence at trial may show;

e. For her costs and disbursements herein, including back wages, front pay, prejudgment interest, reasonable attorney fees and for such other and further relief as the Court may deem just.

Dated this 22nd day of December, 2010.

Stephanie E. Pochop
JOHNSON POCHOP LAW OFFICE
P.O. Box 149
Gregory, SD 57533
(605) 835-8391
Johnson@gwtc.net

Attorney for Plaintiff Holly Eischens